RENDERED: NOVEMBER 9, 2023; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2021-CA-0978-MR

CAROLYN KINDER                          APPELLANT

           APPEAL FROM LOGAN CIRCUIT COURT
v.          HONORABLE JOE W. HENDRICKS, JR., JUDGE
           ACTION NO. 19-CR-00159

COMMONWEALTH OF KENTUCKY              APPELLEE

OPINION
AFFIRMING

** ** ** ** **

BEFORE: COMBS, LAMBERT, AND TAYLOR, JUDGES.

TAYLOR, JUDGE: Carolyn Kinder brings this appeal from a June 25, 2021, final judgment and sentence following a jury trial finding her guilty of conspiracy to commit murder and sentencing her to twelve-years' imprisonment. We affirm.

On August 26, 2015, Bob Wetton was discovered in a barn on his property in Logan County with a fatal gunshot wound to the head. The events leading up to Bob's death began approximately three or four years earlier when

Bob and his wife, Pam Wetton, (collectively referred to as the Wettons) developed a substance-abuse issue with methamphetamine. The Wettons' primary source for methamphetamine was Earl Johnson. In early 2015, Bob agreed to transport methamphetamine for Johnson from Arizona to Kentucky. Pursuant to the agreement, the Wettons would drive to Arizona, purchase a large quantity of methamphetamine with money provided by Johnson, and transport the methamphetamine back to Kentucky. Upon their return to Kentucky, the Wettons would deliver the methamphetamine to Johnson. Johnson would pay the Wettons in cash and methamphetamine. The Wettons made three or four trips to Arizona in early 2015.

In July of 2015, the Wettons made their final trip to Arizona for the purpose of purchasing methamphetamine for Johnson. On the return trip, the Wettons were pulled over by law enforcement in Arizona. A subsequent search of the vehicle revealed approximately 20 pounds of methamphetamine. As a result, the Wettons were arrested and lodged in an Arizona jail.

While the Wettons were jailed in Arizona, one or both of the Wettons decided to cooperate with law enforcement in its pursuit of drug trafficking charges against Johnson. The Wettons remained in custody in Arizona for several days until they could secure bond money. Once the Wettons were back in Logan County, Bob contacted Johnson and told him that if he refused to assist the

Wettons with their legal fees, Bob planned to cooperate with law enforcement in its pursuit of drug trafficking charges against Johnson.

On the afternoon of August 26, 2015, Pam left the Wettons' home to run a few errands. Upon her return, Pam was unable to locate Bob. Pam initially assumed Bob was working on a motorcycle in their barn. As the evening progressed, Pam became concerned and went to the barn in search of Bob. Once inside the barn, Pam noticed a rolled-up rug. Pam discovered Bob's body inside the rug; he had been shot in the back of the head. Pam called 911 for assistance.

Two Logan County Sheriff's Deputies responded to the Wettons' home. Pam informed Deputy Charles Dauley about the circumstances surrounding the Wettons' arrest in Arizona and their agreement to cooperate with Arizona law enforcement in its pursuit of drug trafficking charges against Johnson. Deputy Dauley subsequently obtained a search warrant for Johnson's phones and his residence.

A few days later, while Deputy Dauley was attempting to execute the search warrant at Johnson's residence, another deputy located Johnson and conducted a traffic stop. Johnson had a passenger in his vehicle who was later identified as appellant, Carolyn Kinder. A search of Johnson's vehicle revealed $3,686 in cash and three cell phones. When the deputy asked Johnson and Kinder to step out of the vehicle, Kinder dropped a small baggie containing Valium on the

ground. As Kinder did not have a prescription for the drug, she was arrested and lodged at the Logan County Detention Center.

While Kinder was at the detention center, three inmates reported that Kinder had discussed her involvement with a murder. The three inmates subsequently met with law enforcement and reported the information they had learned. In May of 2019, a Logan County Grand Jury indicted Kinder upon the charge of conspiracy to commit murder.[1]

After placing Kinder under arrest, Detective Kevin Bibb questioned Kinder about her whereabouts on August 26, 2015, the day Bob was murdered. Detective Bibb specifically questioned Kinder about the route she had taken to work on the day of Bob's murder. As part of the investigation, police also subpoenaed Kinder's telephone records. Included in Kinder's telephone records was information known as "Historical Precision Location Information." The location information revealed that at approximately 4:50 p.m. on the day Bob was murdered, Kinder's phone utilized a cell tower located approximately four minutes from the Wetton's home.

---

[1] Carolyn Kinder was also indicted upon the charge of being a persistent felony offender (PFO) in the first degree. The PFO count was dismissed prior to Kinder's trial.

A five-day jury trial ensued in May of 2021. Following the trial, Kinder was convicted of conspiracy to commit murder and sentenced to twelve-years' imprisonment. This appeal follows.

Kinder contends the trial court erred by allowing Pam, Bob's wife, to testify at trial against Kinder remotely *via* Zoom. More specifically, Kinder asserts that allowing Pam to testify remotely violated Kinder's rights under the Confrontation Clause of the Sixth Amendment to the United States Constitution and Section Eleven of the Kentucky Constitution.

Before trial, the Commonwealth filed a motion to permit Pam to testify at trial remotely *via* Zoom. In support of said motion, the Commonwealth asserted that Bob had been murdered in retaliation for his cooperation with Arizona law enforcement related to Johnson's drug trafficking activity and that Pam had also cooperated with Arizona law enforcement. Shortly after Bob's murder, Pam had relocated out of state and there was some concern for her safety if she returned to Logan County. Pam was also diagnosed with various health conditions, including paroxysmal atrial fibrillation, coronary artery disease, and severe arthritis. The Commonwealth further maintained that Pam's testimony would not directly incriminate Kinder. Rather, Pam would merely testify about the Wettons' involvement with Johnson's drug trafficking. The Commonwealth pointed out that Pam would be available by live video and would be subject to

cross-examination in the presence of the jury.  The trial court ultimately permitted Pam to testify remotely.

The Confrontation Clause is found in the Sixth Amendment to the United States Constitution and guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. CONST. amend. VI.  In Kentucky, the right of confrontation is set forth in Section 11 of the Kentucky Constitution and guarantees that "[i]n all criminal prosecutions the accused has the right to . . . meet the witnesses face to face[.]" KY. CONST. § 11.  And, Kentucky courts have held that the right to confrontation under the Sixth Amendment is coextensive to the right under Section 11 of the Kentucky Constitution.  *Sparkman v. Commonwealth*, 250 S.W.3d 667, 669 (Ky. 2008).

Although the Confrontation Clause generally guarantees a criminal defendant the right to face-to-face confrontation of a witness testifying against him, a narrow exception to this general rule was recognized in *Maryland v. Craig*, 497 U.S. 836, 850 (1990).[2]  *See also Campbell v. Commonwealth*, 671 S.W.3d 153, 158 (Ky. 2023).  In *Craig*, the United States Supreme Court recognized that a child sex-abuse victim may be permitted to testify *via* closed circuit television if there exists an adequate showing of necessity as determined on a case-specific

---

[2] Face-to-face confrontation requires that the witness be physically present at the trial.

basis. *Id.* at 855. The case-specific necessity in *Craig* was "to further the important state interest in preventing trauma to child witnesses in child abuse cases[.]" *Id.* at 856-57. The *Craig* Court held that a defendant's "right to confront accusatory witnesses may be satisfied absent a physical, face-to-face confrontation at trial only where denial of such confrontation is necessary to further an important public policy and only where the reliability of the testimony is otherwise assured." *Id.* at 850 (citations omitted).

In the case *sub judice*, the trial court permitted Pam to testify at trial against Kinder remotely *via* Zoom. The trial court stated it had balanced the right under the Confrontation Clause with the necessity presented. The trial court reasoned that Pam was an out-of-state witness with health concerns, and due to those health concerns, there was an adequate showing of necessity to permit Pam to testify remotely *via* Zoom. However, the trial court's analysis falls short of demonstrating the necessity contemplated by *Craig*. *See Craig*, 497 U.S. at 850. While traveling to Kentucky to testify in person at trial may have been a difficult task for Pam, we do not believe Pam's health concerns satisfy the necessity of furthering an important state interest/public policy as required under *Craig*. *See Craig*, 497 U.S. at 850. And, if the Commonwealth had genuine concerns for Pam's safety some seven years after Bob's murder, there were other methods available to protect her as a witness. Therefore, we conclude that allowing Pam to

testify remotely *via* Zoom violated the Confrontation Clause. Having recognized a violation of the Confrontation Clause, we must now determine whether such error was harmless.

Where a violation of the Confrontation Clause has occurred, it must be determined whether the error was harmless beyond a reasonable doubt. *Campbell*, 671 S.W.3d at 161-62; *Sparkman*, 250 S.W.3d at 670; s*ee also Romero-Perez v. Commonwealth*, 492 S.W.3d 902, 907 (Ky. App. 2016). And, in *Campbell*, the Kentucky Supreme Court specifically recognized that "harmlessness must . . . be determined on the basis of the remaining evidence." *Campbell*, 671 S.W.3d at 162 (quoting *Coy v. Iowa*, 487 U.S. 1012, 1021-22 (Ky. 1988)).

In the case *sub judice*, the "remaining evidence" against Kinder or, in other words, the evidence against Kinder absent Pam's testimony, overwhelmingly demonstrated that Kinder was guilty of conspiracy to commit Bob's murder. The "remaining evidence" presented at trial came from the testimony of the three inmates incarcerated with Kinder at the Logan County Jail and also from Detective Bibb. The three inmates testified in detail regarding statements Kinder made while incarcerated. One inmate testified that Kinder was visibly upset upon her arrival to the jail and that she repeatedly talked about her involvement with a murder. Kinder kept repeating that there was "blood everywhere" as Johnson had shot the victim in the head while in a vehicle. May 19, 2021, Trial Video at 9:07:20 –

9:09:56. The same inmate also testified that Kinder said the "big boys from Arizona paid them [Johnson and Kinder] to do in the snitch [Bob]." May 19, 2021, Trial Video at 9:08:40 – 50. Kinder also described to the inmate how she and Johnson placed the victim's body in a barn. Detective Bibb testified regarding his involvement in the investigation of Bob's murder including his questioning of Kinder regarding her whereabouts on the day Bob was murdered. Bibb further testified that his investigation revealed that Kinder's phone had been used near Bob's barn on the afternoon of his murder. Given the totality of the "remaining evidence" presented at trial against Kinder, we believe that any error in admitting Pam's remote testimony was harmless beyond a reasonable doubt. *See Campbell*, 671 S.W.3d at 161-62.

Kinder next contends that the trial court erred by denying her motions for a mistrial. More particularly, Kinder initially asserts the trial court should have granted a mistrial when Detective Bibb testified that he served the arrest warrant upon Kinder at the probation and parole office. Kinder also maintains that the trial court should have granted her a mistrial when the taped interview was played wherein Detective Bibb read Kinder's indictment which included the PFO charge that was subsquently dismissed before trial. Upon denying each of Kinder's motions for a mistrial, the trial court offered to admonish the jury regarding the statements, but Kinder declined the admonitions.

It is well established that "[a] mistrial is 'an extreme remedy to be resorted to only when a fundamental defect in the proceedings has rendered a fair trial manifestly impossible.'" *Hilton v. Commonwealth*, 539 S.W.3d 1, 16 (Ky. 2018) (quoting *Bartley v. Commonwealth*, 400 S.W.3d 714, 735 (Ky. 2013)). The decision to grant or deny a mistrial is within the sound discretion of the trial court, and such decision will not be disturbed absent an abuse of discretion. *Neal v. Commonwealth*, 95 S.W.3d 843, 852 (Ky. 2003). And, the Kentucky Supreme Court has held that where "an admonitory cure is possible, a mistrial is not required . . . [and that] the jury is presumed to follow the trial court's admonition." *Hilton*, 539 S.W.3d at 16 (internal quotation marks and citations omitted). There exist only two situations where a trial court's admonition will not be presumed to cure the reference to evidence that is inadmissible:

> (1) when there is an overwhelming probability that the jury will be unable to follow the court's admonition *and* there is a strong likelihood that the effect of the inadmissible evidence would be devastating to the defendant, . . . or (2) when the question was asked without a factual basis *and* was "inflammatory" or "highly prejudicial."

*Hilton*, 539 S.W.3d at 16 (quoting *Bartley*, 400 S.W.3d at 735) (citation omitted).

At trial, the Commonwealth intended to introduce a recording of the audio interview made when Detective Bibb arrested Kinder upon the charge of conspiracy to commit murder. Kinder filed a motion *in limine* to exclude a certain

-10-

portion of the recorded audio interview that referred to Kinder's being on probation. The Commonwealth agreed to meet with the defense and identify on the recording when Kinder's probation was mentioned and to avoid playing those portions of the recording to the jury. However, during Detective Bibb's testimony, when asked if he served the arrest warrant on Kinder, Detective Bibb responded that he had served the warrant on Kinder at the Warren County Probation and Parole Office. Kinder objected and the trial court sustained the objection. The court offered to admonish the jury, but Kinder declined as she did not wish to draw more attention to the statement.

We do not believe that this passing reference to the probation and parole office created a strong likelihood that its effect would be devastating to Kinder's case. Nor do we believe this statement was inflammatory. *See Hilton*, 539 S.W.3d 1. In fact, the jury may not have even inferred that Kinder was on probation just because she was served with the warrant at the office. Her location was only mentioned in passing and was an isolated reference. *See Hilton*, 539 S.W.3d at 16.

Thereafter, when the audio recording of Kinder's arrest was played for the jury, Detective Bibb can be heard reading the indictment as it existed when Kinder was arrested. When Detective Bibb read count two of the indictment – the first-degree PFO charge – Kinder objected as the charge had been dismissed prior

to trial. The trial court called for a recess, so it could review the video record to determine exactly what had been said on the recording that was played for the jury. Kinder moved for a mistrial. The trial court denied the motion for a mistrial and offered to admonish the jury. Again, Kinder declined the admonishment for fear of drawing more attention to the statement.

Again, we do not believe that Detective Bibb's reference on the recording to Kinder's being indicted upon the charge of PFO in the first degree was devastating to Kinder or highly inflammatory. Rather, it was made in passing, was an isolated event, and was harmless at best. *See Hilton*, 539 S.W.3d 1.

Based on the totality of the circumstances, we are simply unable to conclude that the trial court abused its discretion when denying Kinder's motions for mistrial. Neither Detective Bibb's reference to serving the arrest warrant on Kinder at the probation and parole office or the audio recorded reference to Kinder's indictment upon the PFO charge created a manifest necessity for mistrial or otherwise deprived Kinder of a fair and impartial trial.

We view any remaining contentions of error as moot or without merit.

For the foregoing reasons, the final judgment and sentence of the Logan Circuit Court is affirmed.

ALL CONCUR.

BRIEFS FOR APPELLANT:                    BRIEF FOR APPELLEE:

Jared Travis Bewley                      Daniel J. Cameron
Assistant Public Advocate                Attorney General of Kentucky
Frankfort, Kentucky                      Frankfort, Kentucky

                                         Christopher Henry
                                         Assistant Attorney General
                                         Frankfort, Kentucky